# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

CASE NO. 25-CV-10006-MOORE/Elfenbein

**PJI RESTAURANT LLC**,

     Plaintiff,

v.

**PAPA JOES OF ISLAMORADA, LLC**,
*et al.*,

     Defendants.

_____/

## REPORT AND RECOMMENDATION

**THIS CAUSE** is before the Court on Plaintiff PJI Restaurant LLC's ("Plaintiff") Motion for Entry of Final Default Judgment and Order of Permanent Injunction (the "Motion"). *See* ECF No. [31]. The Honorable K. Michael Moore referred the Motion to me "to take all necessary and proper action as required by law regarding all pre-trial, non-dispositive matters and for a Report and Recommendation on any dispositive matters." *See* ECF No. [18]. For the reasons explained below, I respectfully **RECOMMEND** that the Motion, **ECF No. [31]**, be **GRANTED**.

## I.     BACKGROUND

This case concerns the federally registered trademark "PAPA JOE'S WATERFRONT" ("the Mark") owned by Plaintiff. *See* ECF No. [1] at ¶1; ECF No. [1-4]. The Mark is used in connection with a restaurant that Plaintiff owns and operates called Papa Joe's Waterfront in Islamorada, Florida ("Plaintiff's Restaurant").[1] *See* ECF No. [1] at ¶¶16-18, 23, 27.

---

[1] Because Plaintiff has obtained a clerk's entry of default, *see* ECF No. [15], the Court accepts as true its well-pleaded factual allegations, *see TracFone Wireless, Inc. v. Hernandez*, 196 F. Supp. 3d 1289, 1298 (S.D. Fla. 2016), but not its conclusions of law, *see Surtain v. Hamlin Terrace Found*, 789 F.3d 1239, 1245 (11th Cir. 2015).

### A.      The Trademark Disputes with the U.S. Patent and Trademark Office

In 2021 and in preparation for the opening of Plaintiff's Restaurant, Plaintiff filed its federal trademark application for the Mark and acquired the domain name www.PapaJoesWaterfront.com.  *See* ECF No. [1] at ¶¶15–18.  On October 14, 2021, Plaintiff filed its trademark application for the Mark for intended use with clothing in International Class 25 and restaurant and bar services in International Class 43.  *See* ECF No. [1] at ¶¶16, 40.  Several months later, in July 2022, Defendant Papa Joe's of Islamorada, LLC, ("Defendant") filed four competing applications ("Defendant's Applications") using components of the Mark including the words "PAPA JOE'S" and "PAPA JOE'S OF ISLAMORADA" for intended use in International Classes 25 and 43.  *See* ECF No. [1] at ¶34.  Defendant's Applications claimed a date of first use in commerce of October 19, 1969.  *See* ECF No. [1] at ¶35.

On March 28, 2023, the U.S. Patent and Trademark Office ("USPTO") approved Plaintiff's trademark application and published it for opposition.  *See* ECF No. [1] at ¶17.  On April 12, 2023, the USPTO denied Defendant's Applications with "several objections," one of which was a "Prior Pending Application Advisory," noting Plaintiff's earlier-filed application.  *See* ECF No. [1] at ¶¶39–40.  The USPTO gave Defendant until July 12, 2023 to respond to the trademark denial.  *See* ECF No. [1] at ¶39.  Defendant never responded to the denial of its applications.  *See* ECF No. [1] at ¶45.  On July 27, 2023, the USPTO issued a notice of abandonment, and Defendant never filed a petition to revive its applications.  *See* ECF No. [1] at ¶47.

Instead, on April 27, 2023, Defendant filed a document with the U.S. Trademark Trial and Appeal Board (the "TTAB") requesting a 30-day extension of time to file a notice of opposition against the Plaintiff's application.  *See* ECF No. [1] at ¶41.  Defendant failed to file an opposition within the requested extension.  *See* ECF No. [1] at ¶42.  Again, on May 28, 2023, Defendant

requested a second 60-day extension of time to file a notice of opposition.  *See* ECF No. [1] at ¶43.

Despite the two extensions, Defendant never filed a notice of opposition, nor did Defendant "take

any other action whatsoever to challenge Plaintiff's use or registration of the Plaintiff's Mark."

*See* ECF No. [1] at ¶44.

On June 11, 2024, Plaintiff's trademark application matured into a registration under U.S.

Registration No. 7,414,383.  *See* ECF No. [1] at ¶18.  Plaintiff's registration certificate lists a date

of first use of March 1, 2024.  *Id.*

**B.     Plaintiff's Restaurant Opening and Establishment in the Community**

Plaintiff alleges it has owned the Mark at all material times, which Plaintiff's trademark

application dates and date of first use support.  *See* ECF No. [1] at ¶28.  Plaintiff claims it "has

achieved wide-spread and substantial sales under its Mark, and such use has been continuous and

ongoing."  *See* ECF No. [1] at ¶29.  Both before and following the 2024 opening of Plaintiff's

Restaurant, several publications issued positive articles covering the Restaurant.  *See* ECF No. [1]

at ¶¶11–12, 20–23, 25–26.  Beyond recognition from publications, Plaintiff's Restaurant, brand,

and related goods and services "have received exemplary feedback and reviews from the

consuming public."  *See* ECF No. [1] at ¶27.  Plaintiff's Restaurant has received commendation

on its Google Business Page, where there have been 446 reviews with an average of 4.5 stars, and

on its Yelp page, where it has 101 reviews with an average of 4.2 stars.  *See* ECF No. [1] at ¶27.

Plaintiff operates an Instagram page where it has amassed over 10,000 followers.  *See* ECF No.

[1] at ¶55.

Plaintiff also asserts it "has expended substantial money, time, and effort in advertising,

promoting, and marketing the goods and services bearing the Plaintiff's Mark."  *See* ECF No. [1]

at ¶30.  Moreover, Plaintiff claims its Mark "has been readily recognizable by the public as

associated exclusively with Plaintiff, and has come to identify Plaintiff's services and distinguish said services from the service of others, and has achieved secondary meaning in the minds of the consuming public." *See* ECF No. [1] at ¶31.

### C.   Defendant's Infringing Activities

Despite the USPTO denying its application and being aware of Plaintiff's Mark, Defendant continued using the names "Papa Joe's" and "Papa Joe's of Islamorada" without the Plaintiff's consent.   Indeed, "Plaintiff never licensed, authorized, sponsored, endorsed, or approved of Defendant['s] use of the Plaintiff's Mark (including any confusingly similar variation thereof)." *See* ECF No. [1] at ¶¶54–55. Even so, Defendant has "advertised, promoted, marketed, and offered for sale competing goods and services" under the confusingly similar marks through its website "https://www.flkeys.com" and the Instagram page "PapaJoesFLKeys." *See* ECF No. [1] at ¶¶54–55.   Although Defendant does not own or operate a restaurant, nor is it clear whether Defendant offers merchandise for sale, Defendant's Instagram purports that Defendant "[s]erv[es] Florida Keys cuisine and sell[s] our branded Florida Keys Life apparel at festivals and events." *See* ECF No. [1] at ¶¶55–56, 66.   Defendant's Instagram page has 490 followers, "many of which Plaintiff is informed and believes are customers and prospective customers of the Plaintiff who have mistakenly followed the Defendant['s] social media accounts." *See* ECF No. [1] at ¶55.

Moreover, Defendant owns and operates a Yelp page for a purported restaurant called "Papa Joe's of Islamorada," despite "not owning or operating a restaurant." *See* ECF No. [1] at ¶¶ 55–56, 66.   Defendant's operation of the Yelp page has created numerous incidents of confusion. *See* ECF No. [1] at ¶¶56–60.   Indeed, "each and every review posted on the Defendant['s] Yelp page is specifically referring to the Plaintiff's Mark, and the Plaintiff's goods and services." *See* ECF No. [1] at ¶57 (emphasis removed).   Plaintiff cites several examples of customer photo

reviews taken at Plaintiff's Restaurant but posted on Defendant's Yelp page.  *See* ECF No. [1] at ¶¶58–59.  "Defendant['s] use of 'PAPA JOE'S' deceptively suggests a connection to the Plaintiff and the Plaintiff's mark, and has caused consumer confusion."  ECF No. [1] at ¶60.

Defendant also operates a Google Business Page under the name "Papa Joe's of Islamorada," including a P.O. Box address.  *See* ECF No. [1] at ¶¶66–67.  Defendant's Google Business Page has created incidents of confusion where Plaintiff's customers went to the address listed on the Defendant's Google Business Page and were disappointed when they did not find Plaintiff's Restaurant.  *See* ECF No. [1] at ¶¶67–69.  One prospective customer wrote on Papa Joe's of Islamorada's page: "[w]e thought we were going to Papa Joe's Waterfront, which a friend recommended, and is located at mile marker 79. Disappointed . . . Seems like they did this on purpose to confuse folks."  *See* ECF No. [1] at ¶68.  Due to the Defendant's Google Business Page, "Plaintiff's customers are attributing a false connection and association) between the Plaintiff . . . and the Plaintiff's Mark on the one hand, and the Defendant[] and the infringing mark on the other hand." *See* ECF No. [1] at ¶69 (error in original).

Plaintiff believes that Defendant is engaging in and "will continue to engage in, a deliberate and willful scheme to trade upon and to misappropriate for themselves the good will represented and symbolized by the Plaintiff's Mark through the marketing and sales of competing goods and services bearing the Infringing Mark."  *See* ECF No. [1] at ¶72.  Plaintiff believes Defendant is engaged in willful and intentional infringement in disregard of Plaintiff's rights and will continue to infringe on Plaintiff's mark.  *See* ECF No. [1] at ¶73.

### D.    Plaintiff's Cease and Desist Attempts and the Initiation of this Action

"In December of 2024, and shortly after Plaintiff became aware of Defendant['s] use of the Infringing Mark, Plaintiff's counsel sent a cease-and-desist letter."  *See* ECF No. [1] at ¶70.

Defendant has refused to cooperate with Plaintiff's demand. Due to Defendant's unwillingness to cooperate with the cease-and-desist letter, *see* ECF No. [1] at ¶71, Plaintiff filed this action on January 21, 2025, against Defendant and William Gherkens alleging six claims: (1) federal trademark infringement in violation of 15 U.S.C. § 1114; (2) federal trademark counterfeiting in violation of 15 U.S.C. § 1114; (3) federal unfair competition and false designation of origin in violation of 15 U.S.C. § 1125(a); (4) common law trademark infringement; (5) common law unfair competition; and (6) violation of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"). *See* ECF No. [1] at 24–30, 33.

Defendant and Gherkens had until February 12, 2025 to respond to the Complaint; neither did. *See* ECF No. [9]. On February 18, 2025, Plaintiff moved for entry of Clerk's Default, which the Clerk of the Court entered that day. *See* ECF No. [14]; ECF No. [15]. On February 26, 2025, Plaintiff voluntarily dismissed Gehrkens from the case without prejudice. *See* ECF No. [23]. On February 28, 2025, Plaintiff filed the Motion for Default Judgment. *See* ECF No. [31].

Plaintiff seeks statutory damages, reasonable attorney's fees, and a permanent injunction. *See* ECF No. [31] at 2. For statutory damages, Plaintiff asks for an "award of $150,000 . . . stemming from Defendant's willful trademark counterfeiting and infringement." *See* ECF No. [31] at 11. Plaintiff asks for an award of attorney's fees due to the willful and deliberate nature of the infringement. *See* ECF No. [31] at 12. Plaintiff seeks to enjoin Defendant "including all of its owners, officers, directors, employs, agents, and all other persons acting in concert with Defendant [] from continuing to engage in any conduct that infringes Plaintiff's intellectual property rights." *See* ECF No. [31] at 2; ECF No. [1] at 30 ¶C. This includes the recall and destruction of infringing merchandise and the transfer of domain names, advertising pages, and social media accounts. *See* ECF No. [31] at 16–17; ECF No. [1] at 32 ¶D.

## II.     LEGAL STANDARDS

### A.  Default Judgment Standard

"When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default."  Fed. R. Civ. P. 55 (a).  After the clerk enters a default, the district court is authorized to enter a final default judgment if the party seeking it applies for one.  *See* Fed. R. Civ. P. 55 (b)(2); *Surtain*, 789 F.3d at 1244 ("When a defendant has failed to plead or defend, a district court may enter judgment by default.").

"A 'defendant, by his default, admits the plaintiff's well-pleaded allegations of fact' as set forth in the operative complaint."  *TracFone*, 196 F. Supp. 3d at 1298 (quoting *Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*, 561 F.3d 1298, 1307 (11th Cir. 2009)).  But the defendant "is not held to admit facts that are not well-pleaded or to admit conclusions of law."  *Surtain*, 789 F.3d at 1245 (quotation marks omitted).  And a defendant's default does not automatically permit the Court to enter a default judgment: "Because the defendant is not held to admit facts that are not well pleaded or to admit conclusions of law, the court must first determine whether there is a sufficient basis in the pleading for the judgment to be entered."  *Chanel, Inc. v. Replicachanelbag*, 362 F. Supp. 3d 1256, 1259 (S.D. Fla. 2019); *see also Surtain*, 789 F.3d at 1245 ("Entry of default judgment is only warranted when there is a sufficient basis in the pleadings for the judgment entered." (quotation marks omitted)).

The Eleventh Circuit has "interpreted the standard" for evaluating whether a sufficient basis for default judgment exists "as being akin to that necessary to survive a motion to dismiss for failure to state a claim."  *Surtain*, 789 F.3d at 1245; *see also Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1370 n.41 (11th Cir. 1997) ("[A] default judgment cannot stand on a complaint

that fails to state a claim.").  Of course, to "survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "This plausibility standard is met 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Surtain*, 789 F.3d at 1245 (quoting *Iqbal*, 556 U.S. at 678).

### B. Trademark and Unfair Competition Law

#### 1. Federal Trademark Infringement (15 U.S.C. § 1114)

"Section 32 of the Lanham Act, 15 U.S.C. § 1114, provides liability for trademark infringement if, without the consent of the registrant, a defendant uses 'in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark: which is likely to cause confusion, or to cause mistake, or to deceive.'" *Chanel, Inc.*, 362 F. Supp. 3d at 1262 (quoting 15 U.S.C. § 1114).  "To prevail on a trademark infringement claim under 15 U.S.C. § 1114, the plaintiff must show that it owns a valid trademark, that its mark has priority, that the defendant used such mark in commerce without the plaintiff's consent, and that the defendant's use is likely to cause consumer confusion as to the source, affiliation or sponsorship of its goods or services." *Carnival Corp. v. SeaEscape Casino Cruises, Inc.*, 74 F. Supp. 2d 1261, 1264–65 (S.D. Fla. 1999); *see also Chanel, Inc.*, 362 F. Supp. 3d at 1262 (consolidating those four elements into two: plaintiff "had prior rights to the mark at issue" and defendants "adopted a mark or name that was the same, or confusingly similar to" it "such that consumers were likely to confuse the two").

Registration of a mark with the USPTO is "prima facie evidence" of its "validity," "the registrant's ownership of" it, and "the registrant's exclusive right to use" it "in commerce" or "in connection with the goods or services specified in the registration."  *See* 15 U.S.C. § 1115(a).  A

plaintiff's mark has priority if the plaintiff began using the mark before the defendant began using its competing mark.  *See PetMed Express, Inc. v. MedPets.Com, Inc.*, 336 F. Supp. 2d 1213, 1218 (S.D. Fla. 2004) (noting that plaintiff's mark had priority because it had been selling its products for five years before defendant created the competing domain names).  One way a defendant can use a mark in commerce is by "establishing a website on the Internet" that contains the mark.  *See id.*

"In determining the likelihood of confusion, the court must analyze the following seven factors: (1) the type of trademark; (2) the similarity of the marks; (3) the similarity of the products the marks represent; (4) the similarity of the parties' retail outlets and purchasers; (5) the similarity of the advertising media used; (6) the defendant's intent; and (7) actual confusion."  *Carnival Corp.*, 74 F. Supp. 2d at 1265.  There are "four categories" of marks: generic; descriptive; suggestive; and "fictitious, arbitrary or fanciful."  *See Univ. of Ga. Athletic Ass'n v. Laite*, 756 F.2d 1535, 1540 (11th Cir. 1985) (citation omitted).  "The categories are based on the relationship between the name and the service or good it describes."  *Frehling Enters., Inc. v. Int'l Select Grp., Inc.*, 192 F.3d 1330, 1335 (11th Cir. 1999).

The Eleventh Circuit has described the difference between the categories this way:

> The demarcation between each category is more blurred than it is definite.  A term which suggests the basic nature of the service is generic.  The term Milk Delivery is an example of a generic service mark for a hypothetical milk delivery service.  A generic term is typically incapable of achieving service mark protection because it has no distinctiveness. A descriptive term merely identifies a characteristic or quality of a service. An example of a descriptive service mark might be BarnMilk. Because a descriptive service mark is not inherently distinctive, it may be protected only if it acquires a secondary meaning. The personal name component of a service mark such as Barney's to denote a milk delivery service is also considered not inherently distinctive and hence merely descriptive. However, if the personal name mark acquires secondary meaning, it is afforded the strength of an inherently distinctive mark. Marks which are descriptive of geographic location of the source of the service are treated in the same manner as personal name marks. A suggestive term suggests the characteristics of the service and requires an effort of the

> imagination by the consumer in order to be understood as descriptive of the service. Barn–Barn is an example of a suggestive term. Because a suggestive service mark is inherently distinctive, no proof of secondary meaning is required for it to be protectable. An arbitrary or fanciful term bears no relationship to the service. Arbitrary and fanciful terms are also inherently distinctive, so they are protectable without proof of secondary meaning. Barnbarnfish is an example of an arbitrary or fanciful service mark.

*Investacorp, Inc. v. Arabian Inv. Banking Corp. (Investcorp) E.C.*, 931 F.2d 1519, 1522–23 (11th Cir. 1991) (cleaned up); *see also Frehling Enters., Inc.*, 192 F.3d at 1335 ("An arbitrary mark is a word or phrase that bears no relationship to the product (e.g., 'Sun Bank' is arbitrary when applied to banking services)."); *Laite*, 756 F.2d at 1540 (noting that suggestive marks are "comparatively weak" but "will be protected without proof of secondary meaning" and that fictitious/arbitrary/fanciful marks are "generally inherently distinctive" and therefore "strong" and "afforded the widest ambit of protection").

   "The issue of likelihood of confusion is not determined by merely analyzing whether a majority of the subsidiary factors indicates that such a likelihood exists. Rather, a court must evaluate the weight to be accorded the individual factors and then make its ultimate decision.  The appropriate weight to be given to each of these factors varies with the circumstances of the case." *Suntree Techs., Inc. v. Ecosense Int'l, Inc.*, 693 F.3d 1338, 1346 (11th Cir. 2012) (citations omitted).  "Of these factors, the type of mark and the evidence of actual confusion are the most important in this circuit," *Dieter*, 880 F.2d at 326, but actual confusion "is obviously not a prerequisite to a finding of likelihood of confusion, as it is one of seven factors considered in the likelihood-of-confusion determination," *Wreal, LLC*, 38 F.4th at 137.  "In reviewing the evidence, there are no set rules as to how much evidence of confusion is needed; rather, a district court must take into consideration the circumstances surrounding each particular case." *Lone Star Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc.*, 122 F.3d 1379, 1382 (11th Cir. 1997) (quotation marks

omitted).

### 2. Federal Unfair Competition/False Designation of Origin (15 U.S.C. § 1125(a))

"Section 43(a) of the Lanham Act creates a federal cause of action for unfair competition in interstate commerce, and forbids unfair trade practices involving infringement of trademarks, even in the absence of federal trademark registration." *Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc.*, 508 F.3d 641, 647 (11th Cir. 2007) (alteration adopted, quotation marks omitted). "Section 43(a) is remedial in nature and should be interpreted and applied broadly so as to effectuate its remedial purpose." *Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1193 (11th Cir. 2001). "The law of unfair competition has its roots in the common-law tort of deceit: its general concern is with protecting consumers from confusion as to source." *Suntree Techs.*, 693 F.3d at 1346 (citation and emphasis omitted). "Common law and statutory trademark infringements are merely specific aspects of unfair competition." *Planetary Motion, Inc.*, 261 F.3d at 1193–94 n.5.

"To state a claim for unfair competition and false designation of origin, a plaintiff must show (1) that the plaintiff had enforceable trademark rights in the mark or name, and (2) that the defendant made unauthorized use of it such that consumers were likely to confuse the two," *Brain Pharma, LLC v. Scalini*, 858 F. Supp. 2d 1349, 1355–56 (S.D. Fla. 2012) (quotation marks omitted), which are the same elements required "to prevail on [a] federal claim of trademark infringement," *Suntree Techs.*, 693 F.3d at 1346. *Cf. Chanel, Inc.*, 362 F. Supp. 3d at 1262 (explaining that the "test for liability for false designation of origin under 15 U.S.C. § 1125(a) is the same as for a trademark counterfeiting and infringement claim – i.e., whether the public is likely to be deceived or confused by the similarity of the marks at issue"). Because the "legal standard for unfair competition under both the Lanham Act and the common law has been held to

be essentially the same as the standard for trademark infringement," courts "apply the same seven-factor 'likelihood of confusion' test to claims brought under 15 U.S.C. § 1125(a) as well as infringement claims." *Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc.*, 91 F. Supp. 3d 1265, 1284–85 (S.D. Fla. 2015). A false designation of origin claim "proscribes the behavior of passing off or palming off, which occurs when a producer misrepresents his own goods or services as someone else's." *Custom Mfg.*, 508 F.3d at 647 (quotation marks omitted).

### 3. Florida Common Law Unfair Competition and Trademark Infringement, and Florida Deceptive and Unfair Trade Practices Act

"Courts may use an analysis of federal infringement claims as a measuring stick in evaluating the merits of state law claims of unfair competition." *Planetary Motion, Inc.*, 261 F.3d at 1193 n.4. Indeed, "analysis of the Florida statutory and common law claims of trademark infringement and unfair competition is the same as under the federal trademark infringement claim." *Gift of Learning Found., Inc. v. TGC, Inc.*, 329 F.3d 792, 802 (11th Cir. 2003); *see also Chanel, Inc.*, 362 F. Supp. 3d at 1263 ("The analysis of liability for Florida common law trademark infringement is the same as the analysis of liability for trademark infringement under § 32(a) of the Lanham Act."); *cf. Custom Mfg.*, 508 F.3d at 652 (noting that a plaintiff's "failure to establish a likelihood of confusion as to its Lanham Act claim also extinguishes its claim under Florida law").

The same is true for FDUTPA claims. To prevail on a claim under FDUTPA, a plaintiff must establish: "(1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Nutradose Labs, LLC v. Bio Dose Pharma, LLC*, 710 F. Supp. 3d 1200, 1231 (S.D. Fla. 2024), (quoting *Baptist Hosp., Inc. v. Baker*, 84 So. 3d 1200, 1204 (Fla. 1st DCA 2012)). "A finding of liability for trademark infringement will *per se* constitute a violation of FDUTPA." *See id.* (citing *Casa Dimitri Corp. v. Invicta Watch Co. of Am., Inc.*, 270 F. Supp. 3d 1340 (S.D. Fla. 2017)

(granting summary judgment on both a federal trademark infringement claim and a FDUTPA claim because "[c]ertain state law claims are sufficiently similar to Lanham Act claims [so] that the legal analysis for Lanham Act applies to those state law claims. This is true for . . . FDUTPA[.]")); *see also Suntree Techs.*, 693 F.3d at 1345 (affirming the trial court's granting of summary judgment on a FDUTPA count based on the defendant's violation of federal trademark law).

### C. Forms of Relief Available in Trademark Cases

#### 1. Permanent Injunction

A district court has the "power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office or to prevent a violation under subsection (a), (c), or (d) of section 1125 of this title." *See* 15 U.S.C. § 1116(a). Indeed, injunctive relief "is the remedy of choice for trademark and unfair competition cases, since there is no adequate remedy at law for the injury caused by a defendant's continuing infringement." *Burger King Corp. v. Agad*, 911 F. Supp. 1499, 1509–10 (S.D. Fla. 1995) (quotation marks omitted). In "ordinary trademark infringement actions complete injunctions against the infringing party are the order of the day. The reason is simple: the public deserves not to be led astray by the use of inevitably confusing marks — even in cases in which more than one entity has a legal right to use the mark." *Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*, 522 F.3d 1200, 1209 (11th Cir. 2008) (alteration adopted, citation and quotation marks omitted).

"Under traditional equitable principles, a plaintiff seeking a permanent injunction must demonstrate (1) it has suffered an irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the balance of

hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction." *Id.* at 1208. In "trademark cases, a sufficiently strong showing of likelihood of confusion may by itself constitute a showing of a substantial threat of irreparable harm." *Chanel, Inc.*, 362 F. Supp. 3d at 1263 (alteration adopted, quotation marks omitted).

In this Circuit, courts apply a "presumption of irreparable harm once a plaintiff establishes a likelihood of success on the merits of a trademark infringement claim" because "infringement by its nature causes irreparable harm." *Tiramisu Int'l LLC v. Clever Imports LLC*, 741 F. Supp. 2d 1279, 1287 (S.D. Fla. 2010) (quotation marks omitted). The same presumption applies when analyzing permanent injunctions. *Id.* at 1287 n.4; *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 546 n.12 (1987) (explaining that the "standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success"); 15 U.S.C. § 1116(a) (noting that a plaintiff "shall be entitled to a rebuttable presumption of irreparable harm upon a finding of a violation identified in this subsection in the case of a motion for a permanent injunction").

"[E]ven in a default judgment setting, injunctive relief is available." *Chanel, Inc.*, 362 F. Supp. 3d at 1263. In fact, a defendant's "failure to respond or otherwise appear . . . makes it difficult for" a plaintiff "to prevent further infringement absent an injunction." *Id.* If a court determines that an injunction is warranted, its "broad equity powers allow it to fashion" whatever kind of injunctive relief is "necessary to stop" a defendant's "infringing activities." *Id.* at 1264.

## 2. Other Equitable Relief

Along with permanent injunctions, the court's broad equity powers allow it to fashion whatever relief is necessary to stop or remedy infringing activities in a particular case. *See, e.g.*,

*Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971).  "Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies."  *Id.*  "The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it."  *Id.* (quotation marks omitted).  "Equity has power to eradicate the evils of a condemned scheme by prohibition of the use of admittedly valid parts of an invalid whole."  *United States v. Bausch & Lomb Optical Co.*, 321 U.S. 707, 724 (1944).

In the trademark context, district courts are expressly authorized to order the transfer of domain names that are "identical or confusingly similar to" a protected mark if the person who "registers, traffics in, or uses" the domain name "has a bad faith intent to profit from that mark." *See* 15 U.S.C. § 1125(d)(l)(A).  "In any civil action involving the registration, trafficking, or use of a domain name under" § 1125, "a court may order the forfeiture or cancellation of the domain name or the transfer of the domain name to the owner of the mark."  *See* 15 U.S.C. § 1125(d)(l)(C). Courts have used this authority to order the transfer of infringing domain names, in addition to issuing permanent injunctions, as a means of providing comprehensive relief from future infringement.  *See, e.g.*, *Chanel, Inc. v. besumart.com*, 240 F. Supp. 3d 1283, 1291 & n.4 (S.D. Fla. 2016) (collecting cases in which courts in this District have "ordered the transfer of domain names" when faced with similar factual scenarios).

This is particularly true when defendants "have created an Internet-based counterfeiting scheme in which they are profiting from their deliberate misappropriation of" a plaintiff's rights. *See id.*  Indeed, courts may fashion equitable relief "to eliminate the means by which" defendants conduct "their unlawful activities" and to order "the cancellation or transfer of" domain names to

a plaintiff, "where they may be disabled from further use as platforms for the sale of counterfeit goods." *See id.*  Courts also have the inherent authority to order the transfer of any assets that were restrained "to assure the availability of permanent relief," such as funds that can be "used to satisfy an equitable award of profits."  *Cf. Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 987 (11th Cir. 1995) (recognizing a court's inherent authority "to order preliminary relief, including an asset freeze" to "assure the availability of permanent relief").

### 3.  Statutory Damages

"In a case involving the use of a counterfeit mark . . . in connection with the sale, offering for sale, or distribution of goods or services, the plaintiff may elect . . . to recover, instead of actual damages and profits . . . an award of statutory damages for any such use in connection with the sale, offering for sale, or distribution of goods or services." 15 U.S.C. § 1117(c).  Those statutory damages can be "in the amount of . . . not less than $1,000 or more than $200,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just," or "if the court finds that the use of the counterfeit mark was willful, not more than $2,000,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just." 15 U.S.C. § 1117(c)(1)–(2).

Courts in this District have "defined willful infringement as when the infringer acted with actual knowledge or reckless disregard for whether its conduct infringed upon the plaintiff's copyright." *See PetMed Express, Inc.*, 336 F. Supp. 2d at 1219 (quotation marks omitted).  In addition, courts "may infer that Defendants willfully infringed Plaintiff['s] copyrights because of Defendants' default." *Arista Recs., Inc. v. Beker Enterprises, Inc.*, 298 F. Supp. 2d 1310, 1313 (S.D. Fla. 2003).  "An award of statutory damages is appropriate despite a plaintiff's inability to provide actual damages caused by a defendant's infringement." *See besumart.com*, 240 F. Supp.

3d at 1292.  "Indeed, Congress enacted a statutory damages remedy in trademark counterfeiting cases because evidence of a defendant's profits in such cases is almost impossible to ascertain." *Id.*  Overall, "[d]istrict courts have wide discretion in awarding statutory damages."  *PetMed Express, Inc.*, 336 F. Supp. 2d at 1219.

And as with any other "money judgment in a civil case recovered in a district court," "[i]nterest shall be allowed."  28 U.S.C. § 1961(a); *see also id.* § 1961(b) (explaining that interest "shall be computed daily" and "compounded annually").

### 4. Attorney's Fees

"The court in exceptional cases may award reasonable attorney fees to the prevailing party."  15 U.S.C. § 1117(a).  While § 1117(a) does not define the term "exceptional," the Eleventh Circuit has explained that "to be an exceptional case under the Lanham Act requires only that a case stands out from others, either based on the strength of the litigating positions or the manner in which the case was litigated."[2]  *See Tobinick v. Novella*, 884 F.3d 1110, 1118 (11th Cir. 2018) (quoting *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014) (internal quotation marks omitted)).  "A case will not qualify as exceptional under the Lanham Act merely because one side has zealously pursued or defended its claim, especially on an issue with no directly controlling precedent."  *See id.* at 1119.  Whether a particular case stands out from others is "to be left to the discretion of district courts, considering the totality of the circumstances."  *See id.* at 1117.

### III.   DISCUSSION

As noted above, Plaintiff moves for a final default judgment, a permanent injunction,

---

[2] Plaintiff cites to caselaw indicating that "exceptional" as used in § 1117(a) is defined as "malicious, fraudulent, deliberate, and willful."  *See* ECF No. [31] at 12 (citing *Perry Ellis Int'l, Inc. v. URI Corp.*, No. 06-22020-KMM, 2007 U.S. Dist. LEXIS 77676, at *25 (S.D. Fla. 2007)).  But that caselaw — and thus, that definition — has since been abrogated.  *See Tobinick*, 884 F.3d at 1117–18.

several other forms of equitable relief, statutory damages, and attorney's fees.  *See* ECF No. [31].

Because injunctive relief is warranted only if Defendant has violated one or more of the Plaintiff's

trademark rights, *see, e.g.*, 15 U.S.C. § 1116(a); *Agad*, 911 F. Supp. at 1509–10, the Court first

assesses whether Plaintiff is due a final default judgment on its infringement, counterfeiting, false

designation of origin, and unfair competition claims before evaluating whether it is entitled to a

permanent injunction, other equitable relief, statutory damages, or attorney's fees.

### A.  Final Default Judgment

Plaintiff has already obtained a clerk's default, *see* ECF No. [15], so final default judgment

is appropriate if there is a "sufficient basis" for it in the Complaint, *see Chanel, Inc.*, 362 F. Supp.

3d at 1259; *Surtain*, 789 F.3d at 1245.   A sufficient basis for default judgment exists if the

Complaint states a claim to relief that is plausible on its face — that is, pleads factual content

allowing the Court to draw the reasonable inference that Defendant is liable for counterfeiting,

trademark infringement, false designation of origin, unfair competition, and deceptive and unfair

trade practices.  *See Iqbal*, 556 U.S. at 678; *Surtain*, 789 F.3d at 1245; *Chudasama*, 123 F.3d at

1370 n.41.  Of course, for Defendant to be liable for the claims against it, Plaintiff must have

pleaded factual content establishing each element of those claims.

### 1.  Federal Trademark Infringement and Counterfeiting (Counts I and II)

Under § 1114, Plaintiff must show that: (1) it owns a valid trademark; (2) its mark has

priority; (3) Defendants used the mark in commerce without its consent; and (4) Defendants' use

is likely to cause consumer confusion.  *See Carnival Corp.*, 74 F. Supp. 2d at 1264–65; *Chanel,*

*Inc.*, 362 F. Supp. 3d at 1262.  Plaintiff's well-pleaded factual allegations — which Defendants by

their default have admitted are true, *see TracFone*, 196 F. Supp. 3d at 1298 — satisfy this standard.

Under the first factor, the Mark is a valid mark, federally registered and protected under

U.S. Registration No. 7,414,383 since June 11, 2024.  *See* ECF No. [1] at ¶18.  A registered mark with the USPTO is "prima facie evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the registration."  15 U.S.C. § 1115(a).  Thus, Plaintiff has established prima facie evidence of its Mark's validity and that it has statutory trademark rights in the Mark.  Additionally, Plaintiff "has expended substantial money, time, and effort in advertising, promoting, and marketing the goods and services bearing the Plaintiff's Mark," *see* ECF No. [1] at ¶30, and Plaintiff's trademark application dates and dates of first use support that it has owned the Mark "at all material times."  *See* ECF No. [1] at ¶28.  "[F]or an extended period of time," Plaintiff has achieved "wide-spread and substantial sales under its Mark, and such use has been continuous and ongoing."  *See* ECF No. [1] at ¶29.  Because Plaintiff "extensively uses" the Mark "in the United States in connection with the sale of high-quality goods and services," the Mark "has been readily recognizable by the public as associated exclusively with Plaintiff, and has come to identify Plaintiff's services and distinguish said services from the services of others, and has achieved secondary meaning in the minds of the consuming public."  *See* ECF No. [1] at ¶31.

The Court must next determine whether Plaintiff's Mark has priority over the confusingly similar marks Defendant has been using.  The Complaint alleges that Plaintiff's priority date is the date on which it filed its application with the USPTO in 2021, which is more than one year before Defendant filed its trademark applications (which the USPTO deemed abandoned).  *See* ECF No. [1] at ¶¶34, 47.  However, the Complaint also alleges that, according to Defendant's USPTO applications, Defendant claimed its date of first use in commerce occurred on October 19, 1969.  *See* ECF No. [1] at ¶35. Given Defendant's representations of earlier use in 1969 without

registration of such marks to the USPTO, the Court must determine who has priority to the marks.

When determining when priority is established for an unregistered mark, the Eleventh Circuit has explained that "the date at which petitioner obtained rights in the mark is dependent upon the distinctiveness of the mark." *Coach House Rest., Inc. v. Coach & Six Restaurants, Inc.*, 934 F.2d 1551, 1559 (11th Cir. 1991). "If the mark is not inherently distinctive, a business may obtain ownership rights in the mark when the mark attains a secondary meaning." *Id*. Moreover, "[a] term which suggests the basic nature of the service is generic and is typically incapable of achieving service mark protection because it has no distinctiveness . . . Because a descriptive service mark is not inherently distinctive, it may be protected only if it acquires a secondary meaning." *Id*. at 1560.

Defendant's marks "Papa Joe's" and "Papa Joe's of Islamorada" are, at best, descriptive as the Eleventh Circuit has stated that personal name components of a service mark are considered merely descriptive. *See Investacorp*, 931 F.2d at 1522–23. Additionally, as to "Papa Joe's of Islamorada," "[m]arks which are descriptive of geographic location of the source of the service are treated in the same manner as personal name marks." *See id*. As such, Defendant would only have rights in the marks, and therefore priority, if they achieved secondary meaning, which requires substantial evidence of consumer recognition.

To establish secondary meaning, there must be compelling evidence across four key factors: (1) the length and manner of mark use, (2) the nature and extent of advertising and promotion, (3) efforts to create a public connection between the name and business, and (4) the extent of public identification with the business. *See Coach House*, 934 F.2d at 1560. Critically, the burden of proof lies with Defendant to show its marks have acquired secondary meaning, and in the absence of consumer survey evidence, these factors become paramount. *See id*. ("If a court

finds that the term is descriptive, and hence not inherently distinctive, petitioner must establish that a secondary meaning attached before registrant began using the logo in order to obtain trade identity rights.").  Although Defendant unsuccessfully represented to the USPTO that it had used its marks in commerce since 1969, there is no indication that Defendant has or could establish secondary meaning.  Taking Plaintiff's allegations as true, Defendant could not have obtained rights in the marks to establish priority at all, let alone before Plaintiff obtained rights in its registered Mark.  Given that "federal registration affords the registrant priority over all future users of confusingly similar marks," *see Tana v. Dantanna's*, 611 F.3d 767, 780 (11th Cir. 2010) (citing 15 U.S.C. § 1057(c); *Coach House Rest., 9*34 F.2d at 1564), Plaintiff's Mark became protectable and achieved priority over Defendant's (and all others') future uses of similar marks when Plaintiff filed the application for its Mark with the USPTO in 2021.

Turning to the third factor, whether Defendant used the mark in commerce without Plaintiff's consent, the allegations establish that Defendant has indeed used marks that are confusingly similar counterfeits of Plaintiff's Mark in commerce without its consent.  Defendant's infringing conduct includes operating websites and social media platforms displaying the names "PapaJoesFLKeys," "Papa Joe's Florida Keys," and "Papa Joe's of Islamorada," which are extremely similar to Plaintiff's "Papa Joe's Waterfront" Mark.  *See* ECF No. [1] at ¶¶55, 57, 59, 66.  Additionally, Defendant holds itself out as "[s]erving Florida Keys cuisine and selling our branded Florida Keys Life apparel at festivals and events."  *See* ECF No. [1] at ¶55.  Defendant also owns and operates a Google Business page, a Yelp page, and website all under a confusingly similar mark, where it advertises and (purportedly) sells its competing goods and services.  *See* ECF No. [1] at ¶¶54, 56, 66.  Defendant's claim to owning a restaurant, when it does not, clearly indicates Defendant's intent to confuse consumers.  Additionally, Plaintiff's lack of consent is

clear.  The Complaint alleges that Plaintiff has "never licensed, authorized, sponsored, endorsed, or approved of Defendant['s] use of the Plaintiff's Mark (including any confusingly similar variation thereof)" and Plaintiff sent a cease-and-desist letter to Defendant in December 2024, prior to the filing of this lawsuit.  *See* ECF No. [1] at ¶¶ 53, 70.

Fourth and finally, the Court must consider whether Defendant's use of its marks is likely to cause consumer confusion, and the Court finds that Defendant's use of Papa Joe's and Papa Joe's of Islamorada is likely to, and has caused, consumer confusion.  Looking to the factors that determine likelihood of confusion, *Carnival Corp.*, 74 F. Supp. 2d at 1265, the Court finds that Plaintiff's Mark can fall into the descriptive category, *see Investacorp*, 931 F.2d at 1522–23.  Under the Eleventh Circuit's framework for classifying trademarks, a descriptive mark "merely identifies a characteristic or quality of a service."  *See Investacorp*, 931 F.2d at 1522–23.  Here, "waterfront" directly describes a geographic or physical characteristic of the restaurant — namely, that it is located on or near a waterfront.  As previously stated, the use of "Papa Joe's" is akin to a personal name, and under Eleventh Circuit precedent, personal names are also generally considered descriptive because they do not inherently convey any distinctive quality about the services apart from potentially identifying a proprietor.  *See id.* at 1522–23.  However, Plaintiff's allegations are sufficient to show secondary meaning for its Mark, "Papa Joe's Waterfront."

As to the first and second factors of secondary meaning, the length and manner of mark use and the nature and extent of advertising and promotion, *see Coach House*, 934 F.2d at 1560, Plaintiff's allegations of substantial financial and temporal investments in marketing and promotion support the existence of secondary meaning.  Plaintiff's allegations demonstrate a consistent and pervasive use of the Mark in commerce.  Indeed, Plaintiff cites to several news articles, customer reviews, and a robust social media following of over 10,000 followers,

indicating broad reach and engagement. *See* ECF No. [1] at ¶¶11–12, 20–23, 25–29, 55. These allegations also support the third factor involving Plaintiff's efforts to create a public connection between the name and business. The extensive media coverage, coupled with active social media engagement, demonstrates intentional brand-building strategies. The fourth and final factor, the extent of public identification with the business, is evidenced through Plaintiff's allegations regarding its 446 Google reviews with a 4.5-star average and 101 Yelp reviews with a 4.2-star average as these suggest significant public engagement and positive brand perception. *See* ECF No. [1] at ¶27. These robust consumer interaction metrics along with the digital and traditional media presence discussed with the prior factors substantiate Plaintiff's assertion that the Mark has become "exclusively associated" with its services. Based on the foregoing, Plaintiff's allegations established a strong prima facie case for secondary meaning, satisfying all four key factors outlined in the *Coach House* standard.

Although Plaintiff satisfies the secondary meaning standard, Plaintiff's Mark can also be categorized as a suggestive mark. While it is true that both "Papa Joe's" (a personal name) and "Waterfront" (a geographic descriptor) could, standing alone, be considered descriptive terms, the law recognizes that the combination of two descriptive terms can, when used together as a composite, create a suggestive mark. *See Tancogne v. Tomjai Enterprises Corp.*, 408 F. Supp. 2d 1237, 1244 (S.D. Fla. 2005) (citing 2 *McCarthy on Trademarks and Unfair Competition* § 11.26 (4th ed.) (the combination of descriptive words may result in a suggestive term). The inquiry turns on whether the combined phrase requires an imaginative leap by consumers to connect the mark to the nature of the services provided.

Here, "Papa Joe's Waterfront" does not immediately describe a restaurant or retail business. While "Papa Joe's" suggests ownership or a personal connection and "Waterfront"

suggests proximity to water, consumers must engage in some level of mental effort to connect these terms specifically to restaurant and retail services.[3] The phrase as a whole does not literally describe a restaurant; rather, it evokes an image or ambiance but leaves open to interpretation the exact nature of the goods and services offered. This type of "imaginative leap" is what distinguishes a suggestive mark from a merely descriptive one. *See Frehling Enters.*, 192 F.3d at 1335 (suggestive marks require an effort of imagination to understand the connection to the goods or services). In this respect, "Papa Joe's Waterfront" is akin to other suggestive marks where the name hints at, but does not directly describe, the nature of the business. Much like the mark in *Tancogne* ("Fair & White" for skin products, which suggested but did not describe their effect), Papa Joe's Waterfront conjures imagery but does not describe a specific service or product characteristic. Consumers must infer from the name that the business is a restaurant or retail establishment located on the waterfront, which requires more than a literal understanding of the terms themselves.

Accordingly, "Papa Joe's Waterfront" can also fall into the suggestive category because, although composed of terms that could individually be descriptive, the mark as a whole requires some imagination to connect it to the specific services offered. As a suggestive mark, it is inherently distinctive and entitled to trademark protection without proof of secondary meaning (even though, as discussed above, the well-pleaded allegations in the Complaint demonstrate secondary meaning in Plaintiff's Mark).

Of the seven factors the Court uses to determine the likelihood of confusion, "the type of

---

[3] The term "Waterfront" in Plaintiff's Mark creates an evocative image of maritime ambiance that transcends mere geographic identification, unlike the purely descriptive location term "Islamorada" in Defendant's mark. By conjuring sensory associations and requiring an imaginative interpretive leap, "Waterfront" functions as a suggestive mark that generates emotional engagement and narrative potential, thereby distinguishing Plaintiff's Mark as more distinctive and legally protectable compared to a straightforward geographic reference.

mark and the evidence of actual confusion are the most important in this circuit." *Dieter*, 880 F.2d at 326. Where, as here, defendants "are capitalizing on those words with identical products directed to the same market and bearing a similar mark; by virtue of [d]efendants essentially playing on the registered word combination with a close copy, [p]laintiffs are entitled to the protection of the trademark laws against this particular use, as opposed to non-competing uses." *Tancogne*, 408 F. Supp. 2d at 1246–47. The fact that Defendant's use the words "Papa Joe's" in in combination with the geographic location of the Florida Keys and the operation of a restaurant weighs heavily in favor of finding likelihood of confusion here. Most of the other factors support this conclusion, including the similarity of the marks, the similarity of the products the marks represent, the similarity of the parties' retail outlets and purchasers, the similarity of the advertising media used, and actual confusion. *See Carnival Corp.*, 74 F. Supp. 2d at 1265. In fact, the only factor that does not weigh in favor of Plaintiff is Defendant's intent at time of adoption.

The similarity of the marks is apparent. The Mark "Papa Joe's Waterfront" is strikingly similar to the marks "Papa Joe's" and "Papa Joe's of Islamorada." *See* ECF No. [1] at ¶¶8–9. All the marks are primarily made of the words "Papa Joe's" and because Plaintiff's Restaurant restaurant is in Islamorada, Defendant's use of the mark "Papa Joe's of Islamorada" essentially describes Plaintiff's Restaurant. *See* ECF No. [1] at ¶8. As to actual confusion, Plaintiff has alleged at least fifteen clear instances of actual confusion within a one-year period. *See* ECF No. [1] at ¶¶57–60, 68–69. Examples include Plaintiff's customers leaving reviews, comments, pictures, and videos on Defendant's Yelp page and Google Business Page, and even an instance where a prospective customer got confused and went to the Defendant's P.O. Box instead of the Plaintiff's Restaurant. *Id.* This evidence weighs heavily in favor of Plaintiff due to the numerous instances of actual confusion.

Having met all four elements of federal trademark infringement and counterfeiting under § 1114, Plaintiff has stated a claim to relief that is plausible on its face. *See Iqbal*, 556 U.S. at 678; *Surtain*, 789 F.3d at 1245; *Chudasama*, 123 F.3d at 1370 n.41. As a result, Plaintiff is entitled to final default judgment on Counts I and II. *See Chanel, Inc.*, 362 F. Supp. 3d at 1259; *Surtain*, 789 F.3d at 1245.

## 2.   Federal Unfair Competition and False Designation of Origin (Count III)

Under § 1125(a), Plaintiff must show that: (1) it has enforceable trademark rights in the Mark, and (2) Defendant made unauthorized use of the Mark such that consumers were likely to confuse them with Defendant's imitations. *See Brain Pharma*, 858 F. Supp. 2d at 1355–56. Although described in two elements instead of four, those requirements are the same ones needed for a plaintiff to prevail on a federal claim of trademark infringement. *See Suntree Techs.*, 693 F.3d at 1346; *Chanel, Inc.*, 362 F. Supp. 3d at 1262; *Fla. Int'l Univ. Bd. of Trs.*, 91 F. Supp. 3d at 1284–85. The only real difference between a claim under § 1114 and a claim under § 1125(a) is that relief is available for unregistered marks under § 1125(a) but not under § 1114. *See Custom Mfg.*, 508 F.3d at 647.

But that difference does not change the likelihood-of-confusion analysis because the "legal standard for unfair competition" is "essentially the same" as the one for trademark infringement. *See Fla. Int'l Univ. Bd. of Trs.*, 91 F. Supp. 3d at 1284–85. For that reason, the Court's findings in its analysis of Counts I and II, *see supra* Section III.A.1, apply just as strongly to Count III. Thus, the Court finds that Plaintiff has enforceable trademark rights in the Mark and that Defendant made unauthorized use of the Mark such that consumers were likely to confuse them with Defendant's imitations. *See Brain Pharma*, 858 F. Supp. 2d at 1355–56.

Having met both elements of federal unfair competition and false designation of origin

under § 1125(a), Plaintiff has stated a claim to relief that is plausible on its face. *See Iqbal*, 556 U.S. at 678; *Surtain*, 789 F.3d at 1245; *Chudasama*, 123 F.3d at 1370 n.41. As a result, Plaintiff is entitled to final default judgment on Count III. *See Chanel, Inc.*, 362 F. Supp. 3d at 1259; *Surtain*, 789 F.3d at 1245.

### 3.  Florida Common Law Trademark Infringement (Count IV)

Courts use the same analysis to evaluate Florida common law trademark infringement claims as they do to evaluate federal trademark infringement claims. *See TGC, Inc.*, 329 F.3d at 802; *Chanel, Inc.*, 362 F. Supp. 3d at 1263. For that reason, the Court's findings in its analysis of Counts I and II, *see supra* Section III.A.1, apply also to Count IV. Because Plaintiff met all four elements of federal trademark infringement, the Court finds that it has also satisfied the standard for its Florida common law trademark infringement claim.

Having satisfied the standard for its Florida common law trademark infringement claim, Plaintiff has stated a claim to relief that is plausible on its face. *See Iqbal*, 556 U.S. at 678; *Surtain*, 789 F.3d at 1245; *Chudasama*, 123 F.3d at 1370 n.41. As a result, Plaintiff is entitled to final default judgment on Count IV. *See Chanel, Inc.*, 362 F. Supp. 3d at 1259; *Surtain*, 789 F.3d at 1245.

### 4.  Florida Common Law Unfair Competition (Count V)

Courts use the same analysis to evaluate Florida common law unfair competition claims as they do to evaluate federal trademark infringement claims. *See Planetary Motion, Inc.*, 261 F.3d at 1193 n.4; *TGC, Inc.*, 329 F.3d at 802. For that reason, the Court's findings in its analysis of Counts I and II, *see supra* Section III.A.1, apply also to Count V. Because Plaintiff met all four elements of federal trademark infringement, the Court finds that it has also satisfied the standard for its Florida common law unfair competition claim.

Having satisfied the standard for its Florida common law unfair competition claim, Plaintiff has stated a claim to relief that is plausible on its face. *See Iqbal*, 556 U.S. at 678; *Surtain*, 789 F.3d at 1245; *Chudasama*, 123 F.3d at 1370 n.41.  As a result, Plaintiff is entitled to final default judgment on Count V. *See Chanel, Inc.*, 362 F. Supp. 3d at 1259; *Surtain*, 789 F.3d at 1245.

### 5.  Florida's Deceptive and Unfair Trade Practices Act (Count VI)

Courts use the same analysis to evaluate FDUTPA claims as they do to evaluate federal trademark infringement claims.  *see Crystal Ent. & Filmworks, Inc.*, 643 F.3d at 1323 (11th Cir. 2011) ("[T]he legal standards we apply to [the FDUTPA] claim are the same as those we have applied under section 43(a) of the Lanham Act.").  For that reason, the Court's findings in its analysis of Counts I and II, *see supra* Section III.A.1, apply also to Count VI.  Because Plaintiff met all four elements of federal trademark infringement, the Court finds that it has also satisfied the standard for its FDUPTA claim.

Having satisfied the standard for its FDUPTA claim, Plaintiff has stated a claim to relief that is plausible on its face. *See Iqbal*, 556 U.S. at 678; *Surtain*, 789 F.3d at 1245; *Chudasama*, 123 F.3d at 1370 n.41.  As a result, Plaintiff is entitled to final default judgment on Count VI. *See Chanel, Inc.*, 362 F. Supp. 3d at 1259; *Surtain*, 789 F.3d at 1245.

Accordingly, Plaintiff has met all the elements for federal trademark infringement and counterfeiting under § 1114 (Counts I and II); federal unfair competition, false description and false designation of origin under § 1125(1)(a) (Count III); Florida common law trademark infringement (Count IV); Florida common law unfair competition (Count V); and FDUTPA (Count VI).  For that reason, I respectfully **RECOMMEND** that Final Default Judgment **BE ENTERED** in Plaintiff's favor on Counts I, II, III, IV, V, and VI.  *See* Fed. R. Civ. P. 55 (b)(2); *Surtain*, 789 F.3d at 1244.

### B. Permanent Injunction

Plaintiff has shown it is entitled to final default judgment on Counts I, II, III, IV, V, and VI, *see supra* Section III.A, so the Court must now decide whether a permanent injunction against Defendant is an appropriate remedy, *see* 15 U.S.C. § 1116(a).  As an initial matter, the Court notes that injunctive relief is available in the default judgment setting — particularly in the trademark context — because a defendant's failure to respond or otherwise appear makes it difficult for a plaintiff to prevent further infringement without an injunction.  *See Chanel, Inc.*, 362 F. Supp. 3d at 1263; *Agad*, 911 F. Supp. at 1509–10.

To prove a permanent injunction is warranted here, Plaintiff must demonstrate that it has suffered irreparable harm, remedies like money damages are inadequate, the balance of hardships favors awarding Plaintiff equitable relief, and a permanent injunction would not disserve the public interest.  *See Angel Flight of Ga., Inc.*, 522 F.3d at 1208.  Because Plaintiff has succeeded on its trademark infringement claim, the Court presumes it has been irreparably harmed, which means Plaintiff has satisfied the first element of the permanent injunction test.  *See Tiramisu Int'l LLC*, 741 F. Supp. 2d at 1287 & n.4; *Amoco Prod. Co.*, 480 U.S. at 546 n.12; 15 U.S.C. § 1116(a).  And courts in this District have already held there is no adequate remedy at law for the injury caused by a defendant's continuing infringement, so Plaintiff has satisfied the second element of the permanent injunction test as well.  *See Agad*, 911 F. Supp. at 1509–10.

As to the balance of hardships, Plaintiff stands to suffer "irreparable harm to the goodwill symbolized by Plaintiff's Mark and its reputation to consumers."  *See* ECF No. [1] at ¶64; s*ee Tiramisu Int'l LLC*, 741 F. Supp. 2d at 1287 (explaining that confused consumers who buy the infringing product and are unsatisfied with it "might stop purchasing the original" product, which would leave the mark's owner "at the mercy" of the infringer because it had "no control over the

quality" of the infringing product).  Defendant, on the other hand, has no right to use the Mark so it "could suffer no legitimate hardship by being forced to stop that which it had no right to do." *See id.* at 1288.  Thus, the balance of hardships favors Plaintiff, and it has satisfied the third element of the permanent injunction test.  *See id.*

Finally, the Eleventh Circuit has explained that the public interest relevant to the issuance of a permanent injunction is "the public's interest in avoiding unnecessary confusion."  *See Angel Flight of Ga., Inc.*, 522 F.3d at 1209.  It has also noted "the public deserves not to be led astray" by inevitably confusing marks, which is why a "complete injunction" against an infringer is "the order of the day" in "ordinary trademark infringement actions."  *See id.* (quotation marks omitted). And courts in this District have concluded "the public as a whole has a paramount interest not to be confused" by a defendant's infringement.  *See Tiramisu Int'l LLC*, 741 F. Supp. 2d at 1288 (quotation marks omitted).  Measured against those principles, the Court finds that preventing Defendant from using the Plaintiff's Mark best serves the public interest because products bearing Defendant's marks will likely cause consumer confusion.  *See supra* Section III.A.1.

Plaintiff has satisfied all four prongs of the permanent injunction test.  *See Angel Flight of Ga., Inc.*, 522 F.3d at 1208.  Accordingly, I respectfully **RECOMMEND** that a permanent injunction **BE ISSUED** against Defendant prohibiting it from using the Plaintiff's Mark or the confusingly similar counterfeit marks it has been using.  *See* 15 U.S.C. § 1116(a); *Chanel, Inc.*, 362 F. Supp. 3d at 1264 (noting that a court's broad equity powers allow it to fashion whatever kind of injunctive relief is necessary to stop a defendant's infringing activities**).**

### C.  Other Equitable Relief

Along with a permanent injunction, Plaintiff asks the Court to order additional equitable relief: (1) for Defendant to recall and destroy, all goods, labels, signs, prints, packages, wrappers,

inventory, advertisements, internet advertising and other written or printed materials; and (2) for Defendant to transfer to Plaintiff any applicable domain name registry, all infringing domain names, advertising pages (e.g. Yelp, TripAdvisor, etc.), and social media accounts associated with the Defendant company.  *See* ECF No. [1] at 32, 33; ECF No. [31] at 16, 17.  The Court's broad equity powers allow it to fashion whatever relief is necessary to stop or remedy infringing activities in a particular case.  *See, e.g.*, *Swann*, 402 U.S. at 15; *Bausch & Lomb Optical Co.*, 321 U.S. at 724.

For Plaintiff's first request, this relief is specifically available to courts pursuant to 15 U.S.C. § 1118 which allows courts to order the destruction of all "goods, labels, signs, prints, packages, wrappers, inventory, advertisements, internet advertising and other written or printed material . . . that is the subject of the violation. . . ."  Thus, it is within the Court's powers to grant this remedy.

As for the second request, this remedy is provided to the courts pursuant to 15 U.S.C. § 1125(d)(1)(C), which allows courts to order forfeiture, cancellation, or transfer of a domain name to the owner of a mark.  Although the statute does not speak to the transfer of third-party advertising pages, or social media accounts, this is within the Court's powers to assure permanent relief.  *See Levi Strauss & Co.*, 51 F.3d at 987.  Indeed, the majority of confusion has come with Defendant's operation of a confusingly similar Yelp and Google Business Page.  *See* ECF No. [1] at ¶¶56, 66.  If the Court could not grant transfer of these websites, the Court could not ensure permanent relief.

The court finds that: (1) the destruction of Defendant's goods, labels, signs, prints, packages, wrappers, inventory, advertisements, internet advertising, and other written or printed material; and (2) the transfer of or, in the alternative the cancellation of, any applicable domain

name registry, all infringing domain names, advertising pages (e.g. Yelp, TripAdvisor, etc.), and social media accounts associated with Defendant is a proper equitable remedy to ensure permanent relief.  Therefore, I respectfully **RECOMMEND** that the Final Default Judgment **REQUIRE**: (1) the destruction of Defendant's goods, labels, signs, prints, packages, wrappers, inventory, advertisements, internet advertising, and other written or printed material; and (2) the transfer of or, in the alternative the cancellation of, any applicable domain name registry, all infringing domain names, advertising pages (e.g. Yelp, TripAdvisor, etc.), and social media accounts associated with Defendant.

### D. Statutory Damages

Plaintiff requests statutory damages under 15 U.S.C § 1117(c) in the amount of $150,000. *See* ECF No. [31] at 17.  The federal trademark statute expressly allows Plaintiff to elect to recover, instead of actual damages and profits, an award of statutory damages as a remedy for infringement. *See* 15 U.S.C. § 1117(c).  Those statutory damages can be between $1,000 and $200,000 for each counterfeit mark for each type of good sold (or, if the infringement was willful, up to $2,000,000 for each counterfeit mark for each type of good sold). *See id.* § 1117(c)(1)–(2).  "[A] district 'court has wide discretion in determining the amount of statutory damages to be awarded, *constrained only by the specified maxima and minima*.'" *Top Tobacco, L.P. v. Star Importers & Wholesalers, Inc.*, 135 F.4th 1344, 1350 (11th Cir. 2025) (emphasis in original) (quoting *Cable/Home Commc'n Corp. v. Network Prods., Inc.*, 902 F.2d 829, 852 (11th Cir. 1990)). When awarding statutory damages, these damages should be sufficient to compensate the plaintiff, deter the defendant and others from continuing to infringe on or counterfeit the plaintiff's trademarks, and to punish the defendant.  *See Volkswagen Grp. of Am., Inc. v. Varona*, No. 19-CV-24838, 2021 WL 1997573, at *3 (S.D. Fla. May 18, 2021).

Plaintiff, however, has provided little else in support of its request for $150,000 in statutory damages. "The higher the value of the trademark, the greater the likelihood that the infringement will harm the infringed party's reputation." *Id.* at *10 (citing *Diane Von Furstenberg Studio v. Snyder*, No. 06-CV-1356, 2007 WL 3143690, at *5 (E.D. Va. Oct. 23, 2007)). But Plaintiff fails to provide any evidence as to the value of the Mark. Plaintiff only alleges that the Mark, brand, restaurant, and retail items has provided "substantial" sales and revenue. *See* ECF No. [1] at ¶29. Plaintiff's allegations are insufficient to support the finding that the Mark is world-famous or that Plaintiff has spent sufficient time and money making the Mark "high value." *Id.* Courts in this District have held that much lower amounts were sufficient to deter the defendant and others from infringing activities. *See Skonyon LLC v. Individuals, Partnerships & Unincorporated Associations Identified on Schedule "A"*, No. 23-CV-61527, 2024 WL 5264413, at *5 (S.D. Fla. June 4, 2024) (awarding $2,000 per mark, per type of good because the plaintiff failed to demonstrate harm to justify a statutory damages award in the amount of $200,000 as requested); s*ee, e.g. Shenzhen Dejiayun Network Tech. Co. v. Li*, No. 24-CV-23127, 2025 WL 1436320, at *13 (S.D. Fla. May 20, 2025) (recommending $200,000 for statutory damages even though the plaintiff' requested $2 million and the court found the defendant acted willfully because the plaintiff failed to provide any evidence as to the value of the mark or any evidence to support the requested amount of statutory damages).

Based on the above considerations, as reasonable compensation to Plaintiff and to deter Defendant and others from infringing the Mark — the stated goals of 15 U.S.C. § 1117(c) — I respectfully **RECOMMEND** that Plaintiff **BE AWARDED** $25,000 against Defendant as statutory damages for trademark infringement. Finally, given that "[i]nterest shall be allowed," *see* 28 U.S.C. § 1961(a) and (b), for any money judgment in a civil case, I respectfully

**RECOMMEND** that Plaintiff **BE AWARDED** interest from the date of the Final Default Judgment, computed daily and compounded annually.

### E.   Attorney's Fees

Under 15 U.S.C. § 1117(a) "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." "[T]o be an 'exceptional case' under the Lanham act requires only that a case 'stands out from others,' either based on the strength of the litigating positions or the manner in which the case was litigated." *Tobinick,* 884 F.3d at 1118 (quoting *Octane*, 572 U.S. at 554). The ultimate decision on whether a case stands out as exceptional is left to the discretion of the district courts, considering the totality of the circumstances. *See id.* at 1117 (citing *Octane*, 572 U.S. at 554). This case is not an exceptional case based on the strength of the litigating positions or the manner in which the case was litigated.

Unlike *Tobinick*, this case does not present the type of conduct or litigation history that would support a finding of exceptionality under 15 U.S.C. § 1117(a). In *Tobinick*, the district court found the case exceptional because, after repeated adverse rulings on the merits, the plaintiff continued to multiply the proceedings by seeking to add new parties and claims, advancing baseless allegations of perjury, and filing numerous motions despite clear guidance from the court. *Id.* at 1118. The Eleventh Circuit affirmed that this conduct — persisting in meritless claims, escalating filings after unfavorable rulings, and attempting to relitigate settled issues — made the case "stand out" as "not run-of-the-mill." *Id.* at 1118-19. The appellate court also highlighted how the procedural history showed unnecessary prolonging of the case and abusive litigation tactics. *Id.*

By contrast, nothing in the record here suggests similar conduct. This case does not reflect repeated adverse rulings ignored by Defendant nor efforts to expand the litigation improperly by

adding parties or filing baseless motions.  By contrast, Defendant has neither appeared nor litigated this case resulting in default judgment.  Defendant has not unnecessarily multiplied the proceedings, and there is no indication of abusive litigation tactics akin to those in *Tobinick*.

Moreover, as *Tobinick* itself recognizes, a case will not qualify as exceptional merely because a party zealously pursued its claims or litigated issues on which precedent is unsettled. *See Tobinick*, 884 F.3d at 1119.  Here, there is no evidence of objectively unreasonable legal positions or litigation misconduct by Defendant that would set this case apart from typical trademark disputes.  The claims appear to have been pursued based on factual allegations and legal theories common in Lanham Act litigation, and nothing suggests the case ballooned procedurally in an abusive or extraordinary way.  Considering the totality of the circumstances, this case lacks the hallmarks of exceptionality present in *Tobinick*; therefore, it would not be appropriate to award attorneys' fees under § 1117(a), so I respectfully **RECOMMEND** that Plaintiff's request for attorney's fees be **DENIED**.

## IV.    CONCLUSION

Accordingly, I respectfully **RECOMMEND** that Plaintiff PJI Restaurant LLC's Motion for Entry of Default Judgment, **ECF No. [31]**, be **GRANTED** as follows:

1.      Final Default Judgment **BE ENTERED** in favor of Plaintiff and against Defendant as to all counts of the Complaint;

2.      Defendant and all of its shareholders, owners, principles, members, officers, directors, agents, servants, employees, attorneys, successors, and assigns, and all persons in active concert or participation therewith (collectively, the "Defendant Participants"), be **PERMANENTLY ENJOINED AND RESTRAINED** from:

a.   Using the Plaintiff's Mark (including but not limited to any confusingly similar

variation thereof, such as "PAPA JOES" and/or "PAPA JOE'S OF ISLAMORADA"), or any reproduction, infringement, copy or colorable imitation and any formative variations or phonetic equivalents thereof, or any term, name or mark that incorporates any of the foregoing, or any trademarks similar thereto or likely to be confused therewith, in connection with the distribution, marketing, advertising or sale of any unauthorized goods or the rendering of any unauthorized services;

b.  Infringing the Plaintiff's Mark;

c.  Otherwise unfairly competing with Plaintiff;

d.  Falsely representing itself or its affiliates as being connected with Plaintiff, or sponsored by or associated with Plaintiff, or engaging in any act which is likely to falsely cause the trade, retailers, and/or members of the purchasing public to believe that Defendant or its affiliates are associated with Plaintiff and/or that Plaintiff is associated with Defendant or infringing upon any mark of the Defendant in the use of the Plaintiff's Mark;

e.  Using, applying to register, or registering any logo, business name, social media account/handle/page, trade name, or trademark which may be calculated to falsely represent or which has the effect of falsely representing that the unauthorized goods and services of Defendant, or of any third parties, are sponsored by, authorized by, or in any way associated with Plaintiff and/or that the goods and services of Plaintiff are inferior to, copies of, infringing of or imitations of the goods and services of Defendant;

f.  Using, licensing, advertising, marketing, engaging in any search engine

optimization or online advertising, displaying as a keyword or metatag (including but not limited to the ad text in any Google advertising), the Plaintiff's Mark, or any reproduction, infringement, copy or colorable imitation and any formative variations or phonetic equivalents thereof, or any term, name or mark that incorporates any of the foregoing, or any trademark similar thereto or likely to be confused therewith, in connection with the distribution, marketing, advertising or sale of any unauthorized goods and services;

g.  Maintaining, registering, or renewing any confusingly similar domain names (including but not limited to any which incorporate or resemble, either in whole or in part, any of the Plaintiff's Mark), or any reproduction, infringement, copy or colorable imitation and any formative variations or phonetic equivalents thereof, or any term, name or mark that incorporates any of the foregoing, or any trademark similar thereto or likely to be confused therewith; and

h.   Doing any other act or thing likely to cause the public or the trade to believe that there is any connection between Defendant and Plaintiff, or their respective goods and services or commercial activities.

3.  Defendant is to recall and deliver up for destruction, within twenty (20) days of the date of an issuing order, all goods, labels, signs, prints, packages, wrappers, inventory, advertisements, internet advertising and other written or printed material in the possession or control of Defendant that incorporate or resemble (either in whole or in part) the Plaintiff's Mark or any confusingly similar variations thereof

(including but not limited to "PAPA JOE'S," "PAPA JOES," "PAPA JOES OF ISLAMORADA," and any other variations).

4. Defendant shall transfer to Plaintiff, or alternatively, cancel, any applicable domain name registrar or registry to transfer to Plaintiff, all infringing domain names, advertising pages (*e.g.* Yelp, TripAdvisor, etc.) and social media accounts/handles/pages (including but not limited to Instagram Handle "PapaJoesFLKeys" and Facebook Handle "Papa Joe's Islamorada Florida Keys") that incorporate or resemble (either in whole or in part) the Plaintiff's Mark, and all other domain names and social media accounts/handles/pages owned, maintained, and/or registered by Defendant (or any of its officers, employees, owners, directors, or agents) containing or resembling the Plaintiff's Mark or any confusingly similar variations thereof (including but not limited to "PAPA JOE'S," "PAPA JOES," "PAPA JOES OF ISLAMORADA," and any other variations). Without limiting the foregoing, this provision shall specifically include www.papajoesflkeys.com.

5. Pursuant to 15 U.S.C. § 1117(c), Plaintiff **BE AWARDED $25,000.00** against Defendant.

6. Plaintiff **BE AWARDED** interest from the date of the Final Default Judgment, compounded annually pursuant to the provisions of 28 U.S.C. § 1961.

7. Plaintiff's request for attorney's fees be **DENIED**.

8. The Court **RETAIN** jurisdiction to enforce its Final Default Judgment and permanent injunction.

Pursuant to Local Magistrate Rule 4(b), the Parties will have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written

CASE NO. 25-CV-10006-MOORE/Elfenbein

objections, if any, with the Honorable K. Michael Moore, United States District Judge.  Failure to timely file objections shall bar the Parties from a *de novo* determination by the District Judge of an issue covered in the Report and shall bar the Parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary in the interest of justice.  *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1.

**RESPECTFULLY SUBMITTED** in Chambers in Miami, Florida on July 24, 2025.

**MARTY FULGUEIRA ELFENBEIN**
**UNITED STATES MAGISTRATE JUDGE**

cc:

All Counsel of Record